**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **TRISHA DONEGAN**, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | |
| | § | **EP-22-CV-00332-DCG** |
| **THE TORO COMPANY,** | § | |
| **RADIUS HDD DIRECT, LLC, and** | § | |
| **THE CHARLES MACHINE WORKS,** | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO TRANSFER VENUE**

Defendants The Toro Company ("TTC"), The Charles Machine Works, Inc. ("CMW"), and Radius HDD Direct LLC ("Radius") move to transfer the above-captioned case from this Court's El Paso Division to the U.S. District Court for the Northern District of Texas's Fort Worth Division.  Mot., ECF No. 7, at 11.[1]  Plaintiff Trisha Donegan opposes the Motion.  Resp., ECF No. 19.  The Court **GRANTS** the Motion.

---

[1] Page citations in this Memorandum Opinion and Order refer to the page numbers assigned by the Court's CM/ECF system, not the document's internal pagination.

## I.     BACKGROUND

The Court adapts the following facts from the parties' pleadings, the declarations and other documents that the parties attached to their briefs,[2] and information subject to judicial notice.[3]

### A.     Plaintiff's Allegations

Defendant Radius employed Plaintiff as its Controller from 2019 until 2020.[4]  Employees of two entities related to Radius—namely, Defendants TTC and CMW—supervised Plaintiff during her employment.[5]  As will become relevant below, Plaintiff alleges that she suffers from anxiety, depression, and a breathing condition.[6]

---

[2] *See, e.g.*, *Superior Sales W., Inc. v. Gonzalez*, No. 3:19-CV-329, 2020 WL 10895557, at *1 (W.D. Tex. June 5, 2020) ("While it appears that the Fifth Circuit has not specified evidentiary rules governing a § 1404 motion, courts consistently look at evidence in the record beyond the plaintiff's complaint allegations." (cleaned up)); *Stults v. Maalt Specialized Bulk LLC*, No. 3:17-CV-1683, 2018 WL 1697583, at *1 n.2 (N.D. Tex. Apr. 6, 2018) ("When the Court considers a motion to transfer venue, it may examine affidavits submitted by either party.").

[3] *See, e.g.*, *Aetna Life Ins. Co. v. Methodist Hosps. of Dall.*, No. H-13-3412, 2014 WL 297620, at *3, *5 (S.D. Tex. Jan. 27, 2014) (taking judicial notice of geographical distances and other facts when ruling on motion to transfer venue); *Cortez v. Brad Drake Constr., LLC*, No. 3:15-CV-346, 2016 WL 1312636, at *3 n.1 (W.D. Tex. Apr. 4, 2016) (same).

[4] Am. Compl., ECF No. 18, at 3; Dahl Decl., ECF No. 7, at 14; Am. Answer, ECF No. 21, at 4.

[5] Am. Compl. at 2–3; Am. Answer at 3–4; Dahl Decl. at 14; Sexton Decl., ECF No. 7, at 17.

[6] Am. Compl., at 3.

In March 2020, TTC ordered Plaintiff and other employees to work from home due to the COVID-19 pandemic.[7]  TTC let Plaintiff keep working from home past July 2020 to accommodate her aforementioned health conditions, which she substantiated with a doctor's note.[8]  Thus, during her tenure as Controller, Plaintiff performed all work assignments at either Radius's office in Weatherford, Texas or her home in Hood County, Texas—both of which are in the Northern District of Texas's Fort Worth Division.[9]

During the first portion of Plaintiff's employment with Radius, an employee named Toby Wright was Radius's Production Manager.[10]  Toby's brother Riff, meanwhile, was the General Manager for one of the Defendants.[11]

Plaintiff alleges that Toby "was discriminating against female, transgender and Hispanic employees," and that she therefore reported him to her supervisor and to TTC (which administered at least some of Radius's Human Resources functions).[12]  Plaintiff claims that TTC

---

[7] *Id.*; Am. Answer at 4.

[8] Plaintiff claims she "was allowed to continue to work from home because of her *breathing condition*."  Am. Compl. at 3 (emphasis added).  Defendants, by contrast, assert that "Plaintiff was allowed to continue to work from home based upon a doctor's note . . . indicating Plaintiff was experiencing *anxiety and depression*."  Am. Answer at 4 (emphasis added).  At least for the purposes of this Motion, it doesn't matter which of Plaintiff's health conditions prompted her request to keep working from home.

[9] Sexton Decl. at 17; Original Pet., ECF No. 1-1, at 4 (describing Plaintiff as "an individual residing in Hood County, Texas"); *see also, e.g.*, 28 U.S.C. § 124(2) (specifying that Hood County is in the Northern District of Texas's Fort Worth Division); *Stults*, 2018 WL 1697583, at *2 n.4 ("The Court takes judicial notice that . . . Weatherford [is] located in the Fort Worth Division.").

[10] Am. Compl. at 3; Am. Answer at 4.

[11] The parties dispute which one.  *Compare* Am. Compl. at 3 (CMW), *with* Am. Answer at 4 (Radius); Sexton Decl. at 17 (same).  The dispute is immaterial for the purposes of this Motion.

[12] Am. Compl. at 2–3.  Defendants "admit that Plaintiff was interviewed during an investigation arising out of *another employee's* complaint in April 2020 regarding Toby Wright," but deny that *Plaintiff herself* registered a discrimination complaint against Toby.  Am. Answer at 5 (emphasis added).

performed an internal investigation, concluded "that Toby Wright was mistreating employees," and terminated him accordingly.[13]

According to Plaintiff, Riff "suspected Plaintiff filed the complaint against his brother."[14] Plaintiff therefore claims that after TTC fired Toby, Riff "began to scrutinize Plaintiff's work," stopped "having leadership meetings with Plaintiff," and made "derogatory comments about Plaintiff's mental health."[15]

Defendants ultimately fired Plaintiff too.[16]  Although Plaintiff alleges that Defendants "refused to give her a reason" why they fired her, she claims they did so for two unlawful reasons:

> (1)    Because she has a disability (namely, her anxiety, depression, and/or her breathing condition); and
>
> (2)    Because she reported Toby Wright's allegedly discriminatory behavior to her supervisor and Human Resources.[17]

Plaintiff therefore asserts employment discrimination and retaliation claims against Defendants under the Texas Labor Code.[18]

---

[13] Am. Compl. at 3; *see also* Am. Answer at 5 (admitting that TTC's Human Resources Director "investigated the complaint against Toby Wright and substantiated allegations of unprofessionalism and bullying by Toby Wright," and that Toby "was fired at the direction of [TTC]'s Human Resources Department").

[14] Am. Compl. at 3.  *But see* Am. Answer at 5 (denying that allegation).

[15] Am. Compl. at 3.  *But see* Am. Answer at 5 (denying those allegations).

[16] Am. Compl. at 3–4; *see also* Sexton Decl. at 18 (acknowledging that Defendants terminated Plaintiff); Am. Answer at 6 (same).

[17] Am. Compl. at 4.  Defendants deny Plaintiff's accusations and insist that "[a]ll employment decisions . . . regarding or affecting Plaintiff were based upon legitimate, non-discriminatory, and non-retaliatory reasons, and were made in good faith."  Am. Answer at 9.

[18] Am. Compl. at 4 (citing TEX. LAB. CODE ANN. §§ 21.051, 21.055).

**B.    The Case's Connections to the Current Venue and the Proposed Transferee Venue**

This case is pending in the Western District of Texas's El Paso Division. Although TTC conducts at least some business in El Paso County,[19] there's no indication that any of the events at issue occurred within the El Paso Division, or that Plaintiff or any of the witnesses live or work there.[20]

Defendants attached to their Motion a declaration from TTC's Director of Financial Planning and Analysis (Jesse Sexton), who directly supervised Plaintiff during her tenure at Radius.[21] Sexton declares under penalty of perjury that

(1)    "No decisions concerning Plaintiff's employment, pay, discipline, or termination were made in El Paso;"

(2)    "None of the individuals involved in any personnel decision relating to Plaintiff during her employment with Radius resided or worked in El Paso;" and

(3)    "No records concerning Plaintiff's employment were created or maintained in El Paso."[22]

Plaintiff neither disputes those averments nor offers any evidence to the contrary.[23]

Defendants anticipate that the following fact witnesses will testify if this case proceeds to trial:

---

[19] Plaintiff claims that TTC "has a principal office in . . . El Paso County." *Id.* at 1; *see also* Resp. at 9. Defendants "admit that TTC operates in El Paso County, Texas, but deny that TTC maintains its principal place of business in El Paso County." Am. Answer at 2.

[20] *See* Dahl. Decl. at 14; Sexton Decl. at 17–18.

[21] Sexton Decl. at 17–18.

[22] *Id.*

[23] *See generally* Resp.; Resp. Ex. 1, ECF No. 19, at 11–12; Resp. Ex. 2, ECF No. 19, at 13–14.

(a)     Riff Wright.[24]  Riff lives in or near Weatherford—which, to reiterate, is in the Northern District of Texas's Fort Worth Division.[25]

(b)     A former Radius employee named Mike Self, who (according to Defendants) "complained to management about having to do much of Plaintiff's work."[26]   Self lived in Fort Worth while he was a Radius employee—which, obviously, is in the Northern District of Texas's Fort Worth Division.[27]  As far as Sexton is aware, Self still lives there.[28]

(c)     The medical provider who signed the doctor's note supporting Plaintiff's request to keep working from home.[29]  That note lists a Weatherford office address—which, again, is in the Northern District of Texas's Fort Worth Division.[30]

(d)     Another medical provider who treated Plaintiff during her employment with Radius.[31]  Plaintiff gave Radius a doctor's note from that provider that listed a Stephenville, Texas address.[32]  Stephenville is also in the Northern District of Texas's Fort Worth Division.[33]

(e)     Jesse Sexton, who, as noted, was Plaintiff's direct supervisor.[34]  Sexton lives in Edmond, Oklahoma.[35]

---

[24] Mot. at 3.

[25] Sexton Decl. at 17; *see also supra* note 9 and accompanying text.

[26] Mot. at 3; Sexton Decl. at 17.

[27] Sexton Decl. at 17.

[28] *Id.*

[29] Mot. at 3.

[30] *See* Sexton Decl. at 17; *see also supra* note 9 and accompanying text.

[31] Mot. at 3.

[32] Sexton Decl. at 18.

[33] *See Stults*, 2018 WL 1697583, at *2 n.4 (taking "judicial notice that . . . Stephenville . . . [is] located in the Fort Worth Division").

[34] Mot. at 4; Sexton Decl. at 17.

[35] Sexton Decl. at 18.

     (f)      Vice President <u>Angie Drake</u>, who (according to Defendants) "has knowledge of Plaintiff's performance issues and . . . was involved in the decision to terminate Plaintiff."[36]  Drake lives in <u>Perry, Oklahoma</u>.[37]

Plaintiff doesn't dispute that those witnesses would give testimony germane to this case, or that those witnesses live where Defendants say they do.  *See* Resp. at 5–8.

Plaintiff identifies two other TTC employees who might testify in this case:

     (g)      Internal Audit Manager <u>Diane Noland</u>, who (according to Plaintiff) investigated Plaintiff's complaint against Toby Wright.[38]  As far as the record reveals, Noland lives in or near <u>Bloomington, Minnesota</u>.[39]

     (h)      Human Resources Representative <u>Denise Barnett</u>, who participated in the meeting during which Radius terminated Plaintiff.[40]  The record indicates that Barnett also lives in or near <u>Bloomington, Minnesota</u>.[41]

As the parties' respective witness lists illustrate, many of the prospective witnesses live and work in the Fort Worth Division, but none lives or works in the El Paso Division.

## II.    DISCUSSION

### A.    Applicable Legal Standard

When a federal lawsuit is proceeding in a legally permissible venue, but it would be more convenient for the parties and witnesses to move the case to a different venue, 28 U.S.C.

---

[36] Mot. at 4; Sexton Decl. at 18.  The record doesn't specify which of the Defendants Ms. Drake is the Vice President of, but it's not necessary for the Court to know that to rule on Defendants' Motion.

[37] Sexton Decl. at 18.

[38] Resp. at 8; Am. Compl. at 3; Resp. Ex. 1 at 11.  Defendants claim that the employee who actually investigated the complaint against Toby Wright was TTC's Human Resources Director Pam Cady, who also works in Minnesota.  Am. Answer at 5.

[39] Resp. Ex. 1 at 11–12.

[40] Resp. at 8; Am. Compl. at 4; Am. Answer at 6.

[41] Resp. Ex. 2 at 13–14.

§ 1404(a) empowers the Court to transfer the case "to any other district or division where it might have been brought" so long as doing so is "in the interest of justice."[42]  Section 1404(a) thereby "tempers" the plaintiff's right to pursue a federal lawsuit in the venue of her choosing.[43]

Although "district courts have broad discretion in deciding whether to order a transfer" under § 1404(a), that discretion "is not unbounded;" the court "must exercise its discretion within the bounds set by relevant statutes and relevant, binding precedents."[44]  Thus, the mere "fact that litigating would be *more* convenient for the defendant elsewhere is not enough to justify transfer" under § 1404(a).[45]  Instead, the movant bears the burden to show that "the destination venue is '*clearly* more convenient than the venue chosen by the plaintiff.'"[46]

---

[42] 28 U.S.C. § 1404(a); *see also, e.g.*, *Franco v. Mabe Trucking Co.*, 3 F.4th 788, 793 (5th Cir. 2021) (explaining that § 1404(a) "authorize[s] a discretionary transfer when venue [i]s proper but another venue [i]s more convenient").

A different venue transfer provision applies when a plaintiff initially files a case in an *improper* venue.  *See* 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."); *see also, e.g.*, *Franco*, 3 F.4th at 793 (explaining that § 1406(a) "require[s] a transfer when venue [i]s improper but justice nonetheless weigh[s] in favor of transfer to a proper venue rather than dismissal").

Defendants admit that the Western District of Texas is a proper venue for this lawsuit.  *See* Am. Answer at 2; Reply, ECF No. 22, at 1.  Section 1404(a) therefore applies here instead of § 1406(a).  *Cf., e.g.*, *Lee v. Waste Mgmt. of Tex., Inc.*, No. H-07-2080, 2008 WL 346374, at *1 (S.D. Tex. Feb. 6, 2008) (applying § 1404(a) where defendant seeking transfer "conced[ed] that venue [wa]s proper in" current court).

[43] *See, e.g.*, *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 308, 312–13 (5th Cir. 2008) (en banc) [hereinafter *Volkswagen II*].

[44] *Id.* at 545 F.3d at 310–11 (cleaned up).

[45] *Def. Distributed v. Bruck*, 30 F.4th 414, 433 (5th Cir. 2022) (emphasis added).

[46] *In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 629 (5th Cir. 2022) (emphasis added) (quoting *Volkswagen II*, 545 F.3d at 315); *see also, e.g.*, *Def. Distributed*, 30 F.4th at 433 (explaining that the party seeking transfer bears the burden to "adduce evidence and arguments that clearly establish good cause for transfer based on convenience and justice").

A venue transfer analysis under § 1404(a) "proceeds in two parts."[47]  "First, the district court must ask whether the case 'might have been brought' in the destination venue."[48]  If the answer is yes, the Court must then balance various "private and public interest factors" (called the "*Gilbert* factors").[49]  The private interest factors are:

(1)     The relative ease of access to sources of proof;

(2)     Whether compulsory process is available to secure unwilling witnesses' attendance at trial;

(3)     The cost of attendance for willing witnesses; and

(4)     Any other practical considerations that could make trying the case "easy, expeditious and inexpensive."[50]

The public interest factors, meanwhile, are:

(1)     The administrative difficulties flowing from court congestion;

(2)     The interest in deciding localized issues at home;

(3)     The two venues' respective familiarity with the law governing the case; and

(4)     Avoiding unnecessary problems relating to conflicts of law or applying foreign law.[51]

None of these factors is dispositive; nor are the listed factors exhaustive.[52]

---

[47] *E.g.*, *Planned Parenthood*, 52 F.4th at 630.

A different analytical framework may apply when the parties have a contract with a valid forum selection clause.  *See, e.g.*, *Lopez v. Nat'l Freight, Inc.*, No. 3:22-CV-1844, 2023 WL 2290787, at *3 (N.D. Tex. Feb. 28, 2023).  The parties don't claim they have such a contract, so the Court won't discuss that alternate standard further.  *See generally* Mot.; Resp.; Reply.

[48] *Planned Parenthood*, 52 F.4th at 630.

[49] *E.g.*, *id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)).

[50] *Id.* (quoting *Volkswagen II*, 545 F.3d at 315).

[51] *Id.* (quoting *Volkswagen II*, 545 F.3d at 315).

[52] *Id.*

**B.      Plaintiff Could Have Filed This Case in Fort Worth**

Plaintiff doesn't dispute[53]—and the Court agrees—that Plaintiff could have validly filed this case in the Northern District of Texas's Fort Worth Division in the first instance.[54] Defendants have therefore satisfied their initial burden to show that this case "might have been brought" in the proposed transferee forum.[55]

**C.      The Private Interest Factors**

The Court thus considers the four private interest factors.  As explained below, each of those factors either favors Defendants or favors neither party.

**1.      Access to Sources of Proof**

The first factor—"the relative ease of access to sources of proof"—is neutral here.[56]  To demonstrate that this factor favors transfer, the movant must make "an *actual showing* of the existence of relevant sources of proof" in the transferee venue, "not merely an expression that some sources likely exist in the prospective forum."[57]  Although Defendants' Motion asserts that "the records regarding Plaintiff's employment . . . were created and maintained at Radius in

---

[53] *See generally* Resp.; *see also, e.g.*, *Radoszewski v. Plastics Indus. Ass'n*, No. 3:22-CV-1482, 2022 WL 17330464, at *2 (N.D. Tex. Nov. 29, 2022) (transferring case where plaintiff didn't dispute that he could have filed suit in the transferee court and other factors warranted transfer).

[54] *Compare* 28 U.S.C. § 1391(b) (providing that "[a] civil action may be brought in" (among other venues) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"), *with* Dahl Decl. at 14, *and* Sexton Decl. at 17–18 (indicating that a substantial portion of the events at issue here occurred in the Northern District of Texas's Fort Worth Division, where Plaintiff lived and worked).

[55] *See* 28 U.S.C. § 1404(a); Mot. at 6–7.

[56] *See Planned Parenthood*, 52 F.4th at 630 (quoting *Volkswagen II*, 545 F.3d at 315).  This factor "refers exclusively to sources of *documentary or physical* proof;" "[a]ccess to *witnesses*" is covered by the second and third factors below.  *AGIS Software Dev. LLC v. Huawei Device USA Inc.*, No. 2:17-CV-00513, 2018 WL 2329752, at *3 (E.D. Tex. May 23, 2018) (emphasis added).

[57] *Def. Distributed*, 30 F.4th at 434 (emphasis added).

Weatherford," none of the declarations supporting the Motion expressly say that.[58]  Thus, Defendants haven't established that there are sources of proof in the Northern District of Texas that would favor transferring this case.[59]

But nor does this factor favor Plaintiff.  Although Defendants' employees' declarations don't specify exactly where Plaintiff's employment records are, those employees do at least aver (and Plaintiff doesn't dispute) that those records aren't in El Paso.[60]  In fact, Plaintiff speculates that the records may be at TTC's Minnesota office.[61]  Thus, the location of relevant documents doesn't supply a particularly strong reason to keep this case in El Paso either.

Plaintiff insists that the sources of proof factor "weighs heavily against transfer" here because "most pretrial discovery is facilitated by email and zoom depositions" nowadays, especially now that the COVID-19 pandemic "has forced business and commerce to move to remote access."  Resp. at 5.  While it's true that "[t]he location of evidence bears much more strongly on the transfer analysis when . . . the evidence is physical in nature" rather than digital,[62] the fact that "advances in copying technology and information storage" have made documentary evidence easier to transfer electronically "does not render [§ 1404(a)'s 'access to sources of

---

[58] *Compare* Mot. at 7, *with* Dahl Decl. at 14–15, *and* Sexton Decl. at 17–18.

[59] *Cf., e.g., Radoszewski*, 2022 WL 17330464, at *3 (concluding that "access to sources of proof" factor didn't favor defendant that made unsubstantiated "conclusory assertions" that "all its hard-copy documentation and back-up files [we]re located in" the proposed transferee district (cleaned up)).

[60] *See* Sexton Decl. at 17 ("No records concerning Plaintiff's employment were created or maintained in El Paso, Texas."); *see generally* Resp.

[61] *See* Resp. at 7 ("It is undisputed Defendant [sic] principal place of business is in Bloomington, Minnesota.  Such head quarters [sic] is usually where personnel records of employees are maintained."); *see also* Dahl Decl. at 14 (confirming that TTC "maintains its principal office in Bloomington, Minnesota").

[62] *Planned Parenthood*, 52 F.4th at 630.

proof'] factor superfluous."[63]  In any event, the likelihood that the parties will exchange at least some evidence electronically doesn't affirmatively support keeping this case in El Paso; it "simply makes neither venue more convenient than the other."[64]

In sum, neither party has shown that there are critical sources of proof in either the El Paso Division or the Fort Worth Division, so this factor doesn't favor either party.[65]

### 2.    Availability of Compulsory Process

Nor does the second private interest factor—"the availability of compulsory process to secure the attendance of witnesses"—clearly favor either party here.[66]  Because all of the witnesses live and work more than 100 miles from El Paso, Defendants insist that all of the witnesses are beyond the Western District of Texas's subpoena power.[67]  However, "the availability of compulsory process 'receives less weight when it has not been alleged or shown

---

[63] *Volkswagen II*, 545 F.3d at 316.

[64] *See, e.g.*, *Patterson v. Carpenter*, No. 2:19-cv-00195, 2019 WL 4054991, at *2 (S.D. W. Va. Aug. 27, 2019).

[65] *See, e.g.*, *MacroPoint, LLC v. Ruiz Food Prods., Inc.*, No. 6:16-cv-01133, 2017 WL 3722053, at *1–2 (E.D. Tex. Aug. 29, 2017) (deeming "access to sources of proof" factor "neutral" where "[n]either party . . . offered any specific examples of documents or other evidence either in the [original venue] or in the [proposed transferee venue]" (cleaned up)).

[66] *See Planned Parenthood*, 52 F.4th at 630 (quoting *Volkswagen II*, 545 F.3d at 315).

[67] Mot. at 7–8; Reply at 4; *see also* FED. R. CIV. P. 45(c)(1) (providing, with various exceptions, that "[a] subpoena may command a person to attend a trial, hearing, or deposition *only . . . within 100 miles* of where the person resides, is employed, or regularly transacts business in person" (emphasis added)); FED. R. CIV. P. 45(d)(3)(A) ("[T]he court for the district where compliance is required must quash or modify a subpoena that . . . requires a person to comply beyond the geographical limits specified in Rule 45(c).").

Here and elsewhere in this Opinion, the Court takes judicial notice of the distances between relevant locations.  *See, e.g.*, *Munson S.S. Lines v. Newman*, 24 F.2d 416, 417 (5th Cir. 1928) (taking judicial notice that distance between two cities was "more than 100 miles").

that any witness would be unwilling to testify.'"[68]  Defendants haven't shown that any witness would resist testifying,[69] so the fact that some witnesses might be more amenable to subpoenas in the Northern District doesn't support transferring the case—or, at best, supports it only weakly.[70]

But nor has Plaintiff identified any potentially uncooperative witness who is currently subject to the Western District's subpoena power but would no longer be subject to compulsory process if the Court transferred this case to Fort Worth.[71]  Thus, the compulsory process factor doesn't favor keeping the case in El Paso either.[72]

### 3.     Cost of Attendance

The cost of attendance for *willing* witnesses, however, favors Defendants.

#### a.     Witness Convenience

"The distance between the place where a witness lives or works and the place where the case will be tried is directly proportional to the witness's cost of attendance at trial."[73]  That's because "[a]dditional distance means additional travel time; additional travel time increases the

---

[68] *Planned Parenthood*, 52 F.4th at 630–31 (quoting *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 499 (6th Cir. 2016)).

[69] Although Defendants speculate that "subpoenas *may* be necessary" to compel former employee Mike Self and Plaintiff's healthcare providers to testify, they've introduced no evidence suggesting that those witnesses would be recalcitrant.  *See* Reply at 4.

[70] *See, e.g.*, *MacroPoint*, 2017 WL 3722053, at *3 (deeming "availability of compulsory process" factor "neutral" where (among other things) defendant did "not indicate that any of [its] witnesses would be unwilling to testify at trial" (cleaned up)).

[71] *See generally* Resp.; Resp. Ex. 1 at 11–12; Resp. Ex. 2 at 13–14.

[72] *See, e.g.*, *Crown Crafts Infant Prods., Inc. v. Smart Deals, Inc.*, No. 11-354, 2012 WL 276063, at *2 (M.D. La. Jan. 11, 2012), *report and recommendation accepted by* 2012 WL 275112 (M.D. La. Jan. 31, 2012) (deeming compulsory process factor "equally balanced" where "[n]either party identified any potential unwilling witnesses").

[73] *E.g.*, *Matirne v. Advancial Fed. Credit Union*, No. 6:17-cv-01531, 2018 WL 1023813, at *3 (W.D. La. Feb. 21, 2018).

probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which . . . fact witnesses must be away from their regular employment."[74]

The Court takes judicial notice that many of the witnesses live in the Fort Worth Division, while every witness lives at least 500 miles from the El Paso Division. It is "obvious[ly] . . . more convenient for witnesses to testify at home."[75] Furthermore, every witness who *doesn't* live in the Fort Worth Division—*i.e.*, the witnesses who live in Oklahoma and Minnesota—is closer to Fort Worth than El Paso. Thus, transferring this case would likely reduce the witnesses' travel costs.[76]

The fact that there are more direct flights to and from airports in the Fort Worth area further supports transfer.[77] To the best of the Court's knowledge, there are no nonstop flights from Minnesota to El Paso. Thus, if this case proceeded to trial in this Court, Diane Noland and Denise Barnett—whose Bloomington, MN office is a short drive from Minneapolis-Saint Paul

---

[74] *Volkswagen II*, 545 F.3d at 317 (cleaned up) (quoting *In re Volkswagen AG*, 371 F.3d 201, 205 (5th Cir. 2004) [hereinafter *Volkswagen I*]).

[75] *See id.* (cleaned up) (quoting *Volkswagen I*, 371 F.3d at 205).

[76] *See, e.g.*, *GeoTag, Inc. v. Aromatique, Inc.*, No. 2:10-cv-570, 2013 WL 8349856, at *5 (E.D. Tex. Jan. 14, 2013) (transferring case from Eastern District of Texas's Marshall Division to Northern District of Texas's Dallas Division in part because there were "a number of witnesses for both parties that [we]re within close proximity of the Dallas Division" but there were "no witnesses within a close proximity of Marshall").

[77] *See, e.g.*, *Volkswagen I*, 371 F.3d at 204 n.2, 206 (transferring case from Marshall, Texas to San Antonio partly because several parties "reside[d] in the San Antonio area" and "there [we]re no direct flights between San Antonio and Marshall").

The Court takes judicial notice of whether direct flights between the airport closest to the witness's home city and each party's respective preferred venue exist. *See, e.g.*, *Shale Consultants, L.L.C. v. Wilson*, No. 13-1124, 2013 WL 4750066, at *5 (W.D. La. Sept. 3, 2013) (taking judicial notice of relative number of direct flights to and from current venue compared to those to and from proposed transferee venue). The Court also takes judicial notice of the estimated travel times between airports. *See, e.g.*, *Boller v. Nat'l Mediation Bd.*, 647 F. Supp. 1060, 1062–63 (S.D. Tex. 1986) (taking "judicial notice of the difference in flight times" between various locations).

International Airport (MSP)—could not reach this Division without a connecting flight, and their total travel time (including the layover) could consequently last 5 to 12 hours.  By contrast, there are multiple nonstop flights between MSP and Dallas Fort Worth International Airport (DFW) that last about 2½ hours.[78]

It would likewise be easier for the Oklahoma-based witnesses (Jesse Sexton and Angie Drake) to travel to Fort Worth than to El Paso.  As far as the Court is aware, there are multiple direct flights to DFW from Oklahoma City or Tulsa that last fewer than 1½ hours, but there are none between Oklahoma and El Paso.  Indeed, one can comfortably drive to Fort Worth from Edmond or Perry in 3½ to 4 hours and thereby eliminate airfare expenses altogether.  Driving to El Paso from either of those cities, by contrast, would take 11-12 hours.

> **b.**    **The 100-Mile Rule**

Besides considering the distance between *the witnesses* and each party's preferred venue, the Court must also consider the distance *between the two venues* themselves.[79]  Under Fifth Circuit precedent, if "the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled."[80]  El Paso and Fort Worth are

---

[78] That twofold difference in travel time distinguishes this case from the Northern District of Texas's opinion in *USPG*, on which Plaintiff relies.  *See* Resp. at 7; *see also USPG Portfolio Two, LLC v. John Hancock Real Est. Fin., Inc.*, No. 3:10-CV-2466, 2011 WL 1103372, at *4 (N.D. Tex. Mar. 25, 2011) (determining that witness convenience factor "slightly weigh[ed] against a transfer" where—unlike here—the movant had "not demonstrated that traveling . . . to [the current venue] would be substantially more time consuming" for the witnesses than traveling to the proposed transferee venue).  Plaintiff has also misstated *USPG*'s holding.  *Compare* Resp. at 7 (representing that the *USPG* court "*den[ied]* transfer" (emphasis added)), *with USPG*, 2011 WL 1103372, at *7 ("[T]he court *grants* JH Life Insurance's December 10, 2010 motion to transfer venue." (emphasis added)).

[79] *See, e.g.*, *GeoTag*, 2013 WL 8349856, at *4 (measuring the distance between the current venue's federal courthouse and the proposed transferee venue's federal courthouse).

[80] *Volkswagen II*, 545 F.3d at 317 (quoting *Volkswagen I*, 371 F.3d at 204–05).

about 600 miles apart, so the Court will assign the inconvenience to the witnesses greater weight.[81]

### c.   Employee v. Non-Employee Witnesses

Plaintiff urges the Court to give less weight to the five witnesses who still work for Defendants (Riff Wright, Jesse Sexton, Angie Drake, Diane Noland, and Denise Barnett).[82]

The Court agrees with Plaintiff that "[w]hen the key witnesses are the employees of a party, their convenience is entitled to less weight because that party will be able to compel their testimony at trial" as a condition of their employment.[83]  But the fact that Defendants' employees receive *less* weight doesn't mean they receive *no* weight.[84]  The fact remains that requiring those

---

[81] Plaintiff cites the Fifth Circuit's 1988 decision in *Jarvis Christian College v. Exxon Corp.* for the proposition that "a travel distance of two hundred miles" between the current venue and the proposed venue "d[oes] not warrant transfer." Resp. at 7; *see also Jarvis Christian Coll. v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988) ("This case is not being consigned to the wastelands of Siberia or some remote, distant area of the Continental United States.  The minor inconvenience Exxon may suffer in having to litigate this case in Tyler—only 203 miles distant—rather than in Houston, can in no rational way support the notion [that the district court abused its discretion by transferring the case to Tyler].").  However, the *Jarvis Christian* court "declined to vacate a venue transfer" based on the mere fact that "the *defendant*[] would have . . . to travel 203 miles . . . for trial" in the new venue.  *Aspen Specialty Ins. Co. v. Tech. Indus., Inc.*, No. H-12-1903, 2012 WL 12930997, at *3 n.3 (S.D. Tex. Aug. 30, 2012).  "*Jarvis Christian* did not address *witness* inconvenience," which is critical here.  *See id.*  In any event, 600 miles is far more than 200.

[82] Resp. at 6, 8.

[83] *Joey Recs., Inc. v. Hacienda Recs., L.P.*, No. 10-CA-214, 2010 WL 11601082, at *2 (W.D. Tex. Dec. 6, 2010); *see also, e.g., GUI Glob. Prods., Ltd. v. Samsung Elecs. Co.*, No. 4:20-CV-2624, 2021 WL 3705005, at *6 (S.D. Tex. May 28, 2021); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Lauren Eng'rs & Constructors, Inc.*, No. 3:19-CV-1742, 2019 WL 6071073, at *2 (N.D. Tex. Nov. 14, 2019).

[84] *See, e.g., QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 666 (E.D. Tex. 2007) ("[The plaintiff] seems to assume that the convenience of party witnesses drops from the picture . . . .  While the convenience of non-party witnesses is the most important consideration in analyzing a motion to transfer venue, the Court . . . should still consider the convenience of party witnesses."); *Radoszewski*, 2022 WL 17330464, at *4 (noting that the presence of "party witnesses in the [transferee venue]" still "weigh[s] in favor of transfer," even if it does so "less forcefully" than that of non-party witnesses).

five employees to testify in Fort Worth would be more convenient for all of them, whereas holding a trial in El Paso would be less convenient for everyone.

In any event, even after discounting the inconvenience to Defendants' current employees, that still leaves three non-employee witnesses who (as far as the record reveals) live or work in the Fort Worth Division: Mike Self (who no longer works for Radius and thus is no longer subject to its control),[85] and Plaintiff's two healthcare providers.[86]  Forcing those witnesses to travel to El Paso when they could conveniently testify in their home district would be an unnecessary imposition.

### d.    *Z-Tel Communications*

Plaintiff also maintains that Defendants haven't met their "burden to demonstrate an inconvenience for" the non-employee witnesses because they've neither "point[ed] to any non-employee witness except Plaintiff's doctor that they intend to call as witnesses" nor "proffer[ed] what [their proposed witnesses'] testimony may show."  Resp. at 8.  Plaintiff bases that argument on the Eastern District of Texas's opinion in *Z-Tel Communications, Inc. v. SBC Communications Inc.*, *see* Resp. at 6–7, which states that "the party seeking transfer . . . must clearly specify the key witnesses to be called and make a general statement of what their testimony will cover," 331 F. Supp. 2d 567, 574 (E.D. Tex. 2004).

Plaintiff's assertion that Defendants haven't "point[ed] to any non-employee witness[es] except Plaintiff's doctor" is incorrect.  *Contra* Resp. at 8.  As noted, Defendants intend to call

---

[85] *See, e.g.*, *Nobel Ins. Co. v. Acme Truck Line, Inc.*, No. 3:99-CV-2950, 2000 WL 298908, at *2 (N.D. Tex. Mar. 21, 2000) (prospective witness who "no longer work[ed] for" party didn't qualify as employee witness because employer could no longer "compel her to testify at trial" absent a subpoena).

[86] *See supra* notes 26–33 and accompanying text.

Mike Self—who is no longer a Radius employee—to testify that he "complained to management about having to do much of Plaintiff's work."[87]

In any event, *Z-Tel* is distinguishable because the movant there provided significantly less detail about its prospective witnesses and their expected testimony than Defendants give here. Although the *Z-Tel* movant named six potential employee witnesses, it "offer[ed] virtually no detail as to the nature of [their] anticipated testimony." 331 F. Supp. at 574. Moreover, although the *Z-Tel* movant indicated that it had "begun to identify *a number* of non-party witnesses who [we]re likely to have information relevant to th[e] litigation" and specifically named "two witnesses who [w]ere no longer in [the d]efendant's employ," it didn't specify how many non-employee witnesses were part of that undefined "number," where the unnamed witnesses lived, or the content of their testimony. *Id.* (emphasis added). For those reasons and others, the *Z-Tel* court determined that the witness convenience factor didn't support transfer. *See id.* at 576.

Here, by contrast, Defendants have explicitly named all their current and former employees they anticipate calling as witnesses.[88] Although Defendants haven't provided the names of the two medical providers who wrote Plaintiff's doctor's notes,[89] those healthcare providers aren't some "nebulous group of nonparty witnesses;"[90] they are identifiable individuals whose locations the Court may readily ascertain from the addresses on their notes.[91] The Court

---

[87] Mot. at 3.

[88] *See* Mot. at 3–4 (identifying "Riff Wright," "Mike Self," "Jesse Sexton," and "Angie Drake" as potential "fact witnesses in this case").

[89] *See id.* at 3; Sexton Decl. at 17–18.

[90] *Contra Z-Tel*, 331 F. Supp. 2d at 574.

[91] *See* Sexton Decl. at 17–18.

may therefore reliably gauge the potential inconvenience that haling those witnesses to El Paso may cause.

Nor must this Court guess why the individuals Defendants have identified are key witnesses, what they'll probably say, or why that testimony is relevant to their litigating position. Plaintiff accuses Riff Wright of covertly engineering her termination and "making derogatory comments about [her] mental health," so he'd in all likelihood testify that he didn't do those things.[92]  Defendants expressly state that Mike Self would testify that he "complained to management about having to do much of Plaintiff's work,"[93] which (if true) would support Defendants' claim that they terminated Plaintiff for "performance issues" rather than discriminatory or retaliatory reasons.[94]  Jesse Sexton and Angie Drake would testify about why Defendants chose to terminate Plaintiff.[95]  And Plaintiff's doctors would provide testimony bearing on whether Plaintiff "ha[s] a disability and/or was regarded as disabled" as she alleges in her pleadings.[96]  The Court therefore has sufficient information to determine that all these individuals are key witnesses and evaluate the burden they would endure if this case remains in this venue.[97]

---

[92] *Compare* Am. Compl. at 3, *with* Am. Answer at 5–6 (denying Plaintiff's allegations).  *See also supra* notes 14–17 and accompanying text.

[93] Mot. at 3; Sexton Decl. at 17.

[94] *See* Mot. at 4; Sexton Decl. at 18; Am. Answer at 6–7.

[95] *See* Sexton Decl. at 18 (declaring "[u]nder penalty of perjury" that "Vice President Angie Drake . . . has knowledge of Plaintiff's performance issues and . . . was involved in the decision to terminate Plaintiff"); *id.* at 17 (indicating that Sexton "directly supervised Plaintiff . . . when she worked for Radius"); Am. Compl. at 4 (alleging that Sexton and another employee informed Plaintiff "of her termination in a remote video meeting").

[96] *See* Am. Compl. at 4.

[97] To that extent, this case is unlike this Court's opinion in *Oilfield Equipment Marketing*, on which Plaintiff relies.  *See* Resp. at 7; *see also Oilfield Equip. Mktg., Inc. v. New Tech Sys., Inc.*, No. 05-

e.       **Pretrial Discovery**

Plaintiff also contends that the witness convenience factor "weighs against transfer" because even if the case remains in El Paso, the parties would nonetheless conduct pretrial witness depositions either in the Northern District of Texas or *via* teleconference.[98]  But the question is not merely whether the parties will take *depositions* in a location the witnesses deem convenient; the Court must also consider "the witness[es'] cost of attendance *at trial*."[99]  If this case proceeds to trial in El Paso, the cost for the witnesses to attend that proceeding in person would be unnecessarily higher than if the trial proceeded in Fort Worth, irrespective of where the parties conduct depositions.

---

CA-1038, 2006 WL 897738, at *3 (W.D. Tex. Mar. 23, 2006) (concluding that defendants had "not carried the burden necessary to warrant a transfer under § 1404(a)" where—unlike here—the defendants "identif[ied] only party witnesses" and did not inform the Court of "the substance of [those witnesses' expected] testimony").

[98] *See* Resp. at 5 ("Depositions may be taken in Fort Worth (at the office of Plaintiff's Counsel) or Dallas (at office [sic] of defense counsel).  As it is customary to take the deposition of a party's witness at the office of the party's counsel, it is likely that the depositions of Defendant's [sic] witnesses will occur in Dallas as counsel for the Defendants is located in Dallas.  Thus, witnesses in North Texas would not have to travel far for a deposition.  And just as Defendants filed by [Z]oom [sic], many depositions are now conducted via [Z]oom for the convenience of the witnesses and counsel.").

[99] *See Matirne*, 2018 WL 1023813, at *3 (emphasis added); *see also, e.g.*, *Stults*, 2018 WL 1697583, at *3 ("[T]he location of depositions is not relevant to [the cost of attendance] factor; the cost of attendance for witnesses concerns the cost to appear in court to testify.").

### f.      Plaintiff's Residence

The fact that Plaintiff lives in the Fort Worth Division further supports transferring this case.[100]  It makes far more sense for Plaintiff to litigate her case near her home than in a venue with which she has no apparent connection.[101]

### g.      Conclusion

Thus, on balance, the cost of attendance factor favors Defendants.  Because courts in this Circuit generally deem that factor the most important consideration under § 1404(a),[102] the fact that it supports Defendants weighs heavily towards transfer.

### 4.      Other Pertinent Considerations

The parties haven't identified any considerations that could "make trial of [this] case easy, expeditious and inexpensive" other than those the Court analyzes elsewhere in this Opinion.[103]  The fourth private interest factor is therefore neutral.[104]

---

[100] *See supra* note 9 and accompanying text; *see also Volkswagen II*, 545 F.3d at 317 (fact that two of the three plaintiffs resided in transferee venue "weigh[ed] in favor of transfer").

[101] *See, e.g.*, *Spiegelberg v. Collegiate Licensing Co.*, 402 F. Supp. 2d 786, 791 n.5 (granting defendant's motion to transfer case to Northern District of Texas's Lubbock Division partly because plaintiff resided in Lubbock, thereby making Lubbock "a more convenient forum for [the p]laintiff").

[102] *See, e.g.*, *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. SA-15-CA-32, 2015 WL 11669647, at *3 (W.D. Tex. July 2, 2015); *GeoTag*, 2013 WL 8349856, at *4; *Lawrence v. Del Monte Fresh Produce (Tex.), Inc.*, No. 4:20-CV-04236, 2022 WL 10613774, at *5 (S.D. Tex. Oct. 18, 2022).

[103] *Compare Planned Parenthood*, 52 F.4th at 630 (quoting *Volkswagen II*, 545 F.3d at 315), *with* Mot. at 8–9, *and* Resp. at 4–8.

[104] *See, e.g.*, *Smith's Consumer Prods., Inc. v. Fortune Prods., Inc.*, No. 3:14-CV-00627, 2015 WL 1037419, at *4 (N.D. Tex. Mar. 9, 2015) (finding this factor "neutral" where "neither party addressed" it); *Qualls v. Prewett Enters., Inc.*, 594 F. Supp. 3d 813, 827 (S.D. Tex. 2022) (similar).

**D.      The Public Interest Factors**

Likewise, each of the public interest factors either favors Defendants or favors neither party.

**1.      Court Congestion**

The first public interest factor, "the administrative difficulties flowing from court congestion," doesn't clearly favor either party.[105]  That factor "asks 'not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another court because of its less crowded docket.'"[106]  To perform that analysis, courts commonly take judicial notice of the Administrative Office of the U.S. Courts' quarterly Federal Court Management Statistics (FCMS) and compare their own numbers to those of the proposed transferee court to determine which venue is more backlogged.[107]

The most recent edition of those statistics points in opposing directions here.  On one hand, the total number of pending civil and criminal cases per judgeship in each District favors transferring the case.[108]  As of March 31, 2023, the Northern District had 485 pending cases per judicial seat, while the Western District had 834—an almost twofold difference.  That

---

[105] *See Planned Parenthood*, 52 F.4th at 630 (quoting *Volkswagen II*, 545 F.3d at 315).

[106] *Betty's Best, Inc. v. Yuyao Aggpo Elec. Tech. Co.*, No. 1:22-CV-1078, 2022 WL 17724417, at *3 (W.D. Tex. Dec. 15, 2022) (quoting *Hillestad v. LLOG Expl. Co.*, No. 3:17-CV-00341, 2018 WL 4938708, at *7 (S.D. Tex. Sept. 20, 2018)).

[107] *See, e.g.*, *Lopez*, 2023 WL 2290787, at *6 ("[D]istrict courts typically determine this factor by comparing judicial district statistics."); *Hong v. Recreational Equip., Inc.*, No. 19-0951, 2019 WL 5536406, at *7 & n.3 (W.D. Wash. Oct. 25, 2019) (taking judicial notice of the FCMS).

Current and historical versions of the FCMS are available at https://www.uscourts.gov/statistics-reports/analysis-reports/federal-court-management-statistics.

[108] *See, e.g.*, *Boswell v. St. Dominic Health Servs., Inc.*, No. 3:23-CV-151, 2023 WL 3510414, at *4 (S.D. Miss. May 17, 2023) (consulting the FCMS to determine the number of active cases per judgeship in both the current venue and the proposed transferee venue).

discrepancy exists partly because this Court "has one of the busiest criminal dockets in the country," which reduces the relative proportion of time this Court may devote to civil cases.[109] In that respect, the Northern District's docket is much less crowded, which could result in a quicker resolution of this case.[110]

By other metrics, however, the Northern District appears more congested. For instance, the median amount of time it takes civil cases to reach a disposition[111]—which at least one court in this Circuit deems "the most critical statistic"[112]—is 7.6 months in the Western District and a substantially longer 30.2 months in the Northern District.

The Court thus cannot confidently predict whether this case would proceed more quickly in this Court or the Northern District of Texas.[113] The Court therefore deems this factor neutral.

---

[109] *Betty's Best*, 2022 WL 17724417, at *3.

[110] *See, e.g.*, *Smith v. FCA U.S., LLC*, No. 3:20-CV-56, 2020 WL 4353178, at *6 (W.D. Tex. July 29, 2020) (transferring case from Western District of Texas to Northern District of Texas in part because "there are significantly more case filings per judge in the Western District").

Some courts in this Circuit "use[] the metric of *weighted* filings per judgeship"—which "assign[s] different weights to different types of cases" based on how much time they take to resolve—instead of "simple caseload statistics." *See Radoszewski*, 2022 WL 17330464, at *5–6 (emphasis added). By that measure, the Western District (with 848 weighted filings per judgeship) is still more congested than the Northern District (which has 557 weighted filings per judgeship).

[111] *See, e.g.*, *Qualls*, 594 F. Supp. 3d at 825 ("When evaluating [the court congestion] factor, courts often look to the median interval time between filing a case to disposition.").

[112] *See, e.g.*, *Atchafalaya Basinkeeper v. Bernhardt*, No. 20-00651, 2021 WL 3463904, at *3 (M.D. La. Mar. 12, 2021) (quoting *Red Barn Motors, Inc. v. Nextgear Cap., Inc.*, No. 13-00778, 2014 WL 4986674, at *10 (M.D. La. Sept. 29, 2014)). *But see, e.g.*, *Lawrence*, 2022 WL 10613774, at *6 (considering both "the median time between the filing and disposition of a civil case" and each District's "total case filings per judge" without suggesting that either consideration is more important than the other).

[113] *Cf. Planned Parenthood*, 52 F.4th at 631 (acknowledging that the court congestion factor may be "speculative").

## 2.      Localized Interests

However, the second public interest factor—"the local interest in having localized

interests decided at home"—favors transfer.[114]

When evaluating that factor, courts consider "the location of the injury, witnesses, and

the Plaintiff's residence."[115]  Plaintiff experienced the injury resulting from her allegedly

unlawful termination in the Northern District of Texas's Fort Worth Division, where she lived

and worked.[116]  Several witnesses live and/or work in the Fort Worth Division, while none live

or work in the El Paso Division.[117]  And as far as the docket reveals, Plaintiff still lives in the

Fort Worth Division.[118]  Thus, each of those three subfactors favors Defendants.

Courts applying this factor also consider "the place of the alleged wrong," which "is one

of the most important factors in venue determinations."[119]  The record indicates—and Plaintiff

doesn't dispute—that "[n]o decisions concerning Plaintiff's employment, pay, discipline, or

termination were made in El Paso," and "[n]one of the individuals involved in any personnel

decision relating to Plaintiff during her employment with Radius resided or worked in El

Paso."[120]  The "place of the alleged wrong" subfactor thus doesn't favor keeping this case in this

Division as Plaintiff contends.  To be sure, that subfactor doesn't favor transferring the case to

---

[114] *See id.* at 630 (quoting *Volkswagen II*, 545 F.3d at 315).

[115] *Def. Distributed*, 30 F.4th at 434.

[116] *See supra* note 9 and accompanying text.

[117] *See supra* notes 24–41 and accompanying text.

[118] *See supra* note 9 and accompanying text; *see also Stults*, 2018 WL 1697583, at *4 (finding that "the local interest factor . . . weigh[ed] in favor of transfer" to Fort Worth in part because the plaintiff "reside[d] in Fort Worth").

[119] *Def. Distributed*, 30 F.4th at 434 (cleaned up).

[120] Sexton Decl. at 17–18; *see also supra* notes 22–23 and accompanying text.

Fort Worth either.  The record suggests that Defendants made "the decision to terminate Plaintiff" in either Oklahoma or Minnesota.[121]  But the fact that the other subfactors favor the proposed transferee venue—while none favor the current venue—tips the balance toward Defendants.

Plaintiff insists that this factor favors her because "El Paso, with a population that is over 78% Hispanic, has an interest in" ensuring that "employees[] like Plaintiff who opposed discrimination against Hispanics" not be "retaliated against by major local employers like" TTC, which employs workers in El Paso.  Resp. at 9.  But Plaintiff has not cited—and the Court's independent research has not located—any authority suggesting that courts should compare competing venues' racial or ethnic demographics when applying § 1404(a)'s second public interest factor.  *See id*.  If anything, Hispanic workers in the Fort Worth Division have a greater localized interest in ensuring that employers don't retaliate against employees who defend Hispanics' rights in that Division.[122]

Because the "local interest" factor is one of the "most important factors in the venue analysis,"[123] the fact that it favors Defendants here strongly favors transferring the case.

---

[121] *See* Sexton Decl. at 18; Resp. at 8; Resp. Ex. 2 at 13.

[122] *Cf. Duffy v. Facebook, Inc.*, No. 16-cv-06764, 2017 WL 1739109, at *1, *7 (N.D. Cal. May 4, 2017) ("Plaintiff . . . notes that the discrimination against Plaintiff 'appears to be part of a larger problem of uncorrected racial bias at Facebook[,' which has its principal place of business in the current venue (the Northern District of California).]  That may be, but the controversy in this case is not about 'a larger problem' at Facebook in general, but the alleged discrimination against Plaintiff in particular.  [North Carolina—where the plaintiff worked for Facebook, and where he still resides—has] a greater local interest because the lion's share of the discriminatory events occurred in North Carolina." (cleaned up)).

[123] *Qualls*, 594 F. Supp. 3d at 827.

### 3.      Familiarity With Governing Law

The third public interest factor—familiarity with applicable law—favors neither party.[124] Both this Court and the proposed transferee court are in Texas, so both courts have comparable expertise applying the Texas antidiscrimination statutes Plaintiff invokes here.[125]

### 4.      Conflict of Laws/Foreign Law

As far as the Court is aware, this case implicates neither a conflict of laws nor the application of foreign law, so the final factor is neutral too.[126]

## E.      Balancing the Factors

In sum, two of the public and private interest factors—including the two most important ones—favor Defendants, six factors are neutral, and none favors Plaintiff.[127]  Where, as here, "not a single relevant factor favors the plaintiff['s] chosen venue," it would be an "extraordinary error" not to transfer the case.[128]

---

[124] *See, e.g.*, *In re Radmax, Ltd.*, 720 F.3d 285, 289 (5th Cir. 2013) (agreeing that familiarity factor was "neutral" where transferor and transferee court were "equally capable of applying the relevant law").

[125] *See, e.g.*, *Smith*, 2020 WL 4353178, at *6 (concluding that transferring case arising under Texas law from Western District of Texas to Northern District of Texas "would not raise issues relating to familiarity with law").

[126] *See, e.g.*, *Cortez*, 2016 WL 1312636, at *3 (deeming this factor "neutral" where "the parties . . . presented no facts . . . indicat[ing] that either venue would avoid unnecessary problems of conflict of laws or of foreign law").

[127] *But see Radmax*, 720 F.3d at 290 & n.8 (tallying the factors that favored each party, but cautioning that courts should not merely "count[] . . . the factors in each side, weigh[] each the same and decid[e] transfer only on the resulting 'score'").

[128] *See id.* at 290 (cleaned up) (quoting *Volkswagen II*, 545 F.3d at 318).

### III.    CONCLUSION

The Court therefore **GRANTS** "Defendants' Opposed Motion to Transfer Venue

Pursuant to 28 U.S.C. § 1404(a)" (ECF No. 7) and **TRANSFERS** this case to the **U.S. District**

**Court for the Northern District of Texas, Fort Worth Division**.[129]

**So ORDERED and SIGNED this 5th day of June 2023.**

_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

---

[129] Section 1404(a) empowers this Court to select which of the Northern District of Texas's divisions will receive the case.  *See* 28 U.S.C. § 1404(a) ("[A] district court may transfer any civil action to any other district *or division* . . . ." (emphasis added)); *see also, e.g.*, *All-Am. Moving Grp., LLC v. XO Commc'ns Servs., LLC*, No. 2:20-cv-2111, 2020 WL 13616873, at *5 (W.D. Tenn. Dec. 7, 2020) ("[T]ransfer to a specific division [of the transferee court] is expressly permitted under § 1404(a)."); *Aetna*, 2014 WL 297620, at *5 (choosing to transfer case from Southern District of Texas to Northern District of Texas's Dallas Division, rather than the Northern District's Fort Worth Division as another defendant urged).